IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal No. 2:23-cr-20191-MSN |
| | ) |
| | ) |
| EMMITT MARTIN, III, et al., | ) |
| | ) |
| Defendants. | ) |

**RESPONSE IN OPPOSITION
TO DEFENDANT BEAN'S MOTION FOR A CHANGE OF VENUE**

The United States respectfully opposes Defendant Tadarrius Bean's Motion for a Change of Venue or, in the Alternative, to Expand the Jury Venire Outside of Shelby County, Tennessee. (ECF No. 119.)   Defendant Bean has failed to meet his heavy burden to demonstrate presumptive pretrial jury prejudice on any basis, including negative publicity, and his motion should be denied.

**Factual and Procedural Background**

A.  Factual Background

On January 7, 2023, Tyre Nichols was the subject of a traffic stop by Memphis Police Department (MPD) officers, including two of the defendants.   According to the officers, they stopped Nichols because he was speeding and committing traffic infractions.   The officers pulled Nichols from his car; repeatedly threatened him, including by threatening to "knock [his] a** out"; and used force on him following the traffic stop.   Nichols, as captured on body-worn camera footage, protested that the officers were "doing a lot" and said that he was "just trying to go home." When the officers continued to use force, Nichols ran from the scene.   The officers, joined by the

remaining defendants, pursued him. When the defendants caught Nichols, they struck, batoned, and kicked him, including in the head. Nichols was transported to the hospital where he succumbed to his injuries and died three days later.

Local news media began reporting on Nichols' arrest shortly after he was hospitalized. After Nichols' death, the story became a topic of national news and was widely covered by print and broadcast media. On January 25, 2023, the State criminally charged the defendants in connection with Nichols' death. On January 27, 2023, just under three weeks after Nichols' arrest, MPD released SkyCop and some body-worn video footage of the arrest. Local and national news media reported extensively on this footage, as well as on the personnel and policy actions taken by MPD and other law enforcement entities in the wake of Nichols' death. On September 12, 2023, the defendants were federally charged. (ECF No. 1.)

B. Procedural History

The federal indictment charges each defendant with four felony counts stemming from the Nichols arrest. Count One charges the defendants with, while acting under color of law, willfully violating Nichols' Fourth Amendment right to be free from the use of unreasonable force by a police officer, resulting in his injury and death, in violation of 18 U.S.C. § 242. Count Two charges the defendants with violating the same statute by, while acting under color of law, willfully violating Nichols' Fourteenth Amendment right to be free from police officers' deliberate indifference to his serious medical needs, resulting in his injury and death. Count Three charges the defendants with conspiring to engage in witness-tampering by conspiring to withhold truthful information and to provide misleading information to their supervisor and others, in violation of 18 U.S.C. § 1512(k), while Count Four charges the defendants with so doing by in fact withholding information and providing false and misleading information to their supervisor and others, in

violation of 18 U.S.C. § 1512(b)(3). (ECF No. 1.)

Trial in the case is set for May 6, 2024. (ECF No. 51.) Defendant Bean moved for a change of venue, or, in the alternative, an expansion of the venire. (ECF No. 119.)

C. Jury Selection in the Western District of Tennessee

The prospective jury pool for federal criminal juries in the Western Division of the Western District of Tennessee is drawn from all of the counties in the Division: Fayette, Lauderdale, Tipton, and Shelby Counties. *See* Map of the Divisions of the Western District of Tennessee, https://www.tnwd.uscourts.gov/sites/tnwd/files/TNWD_Jurisdiction.pdf; Western District of Tennessee Amended Plan for the Random Selection of Grand and Petit Jurors (Nov. 9, 2020), https://www.tnwd.uscourts.gov/sites/tnwd/files/JuryPlan.pdf.

## Legal Background

The Constitution requires that criminal trials be held before "an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI; *see* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."). This constitutional requirement yields only rarely, as in the event "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010). Federal Rule of Criminal Procedure 21 accordingly requires transfer only "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant *cannot* obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a) (emphasis added).[1]

To make such a showing, a defendant must establish actual prejudice, typically during *voir*

---

[1] The defendant does not apparently seek discretionary transfer pursuant to Federal Rule of Criminal Procedure 21(b), but even if he had, such a request should also be denied. Transfer to another venue would not serve "the convenience of the parties, any victim [or the victim's family], [or] the witnesses," almost all of whom live and/or work in Shelby County. Fed. R. Crim. P. 21(b).

*dire*, or presumptive prejudice.[2] *United States v. Poulsen*, 655 F.3d 492, 506 (6th Cir. 2011); *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) ("Prejudice resulting from pretrial publicity can be presumptive or actual. . . . The primary tool for discerning actual prejudice is a searching *voir dire* of prospective jurors."). Presumptive prejudice exists only "where press coverage 'utterly corrupted' a trial's atmosphere." *Mammone v. Jenkins*, 49 F.4th 1026, 1043 (6th Cir. 2022) (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975)), *cert. denied*, 143 S. Ct. 2568 (2023). In other words, prejudice may only be presumed when "publicity in essence displaced the judicial process." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998).

"[S]uch extreme cases are rare." *Mammone*, 49 F.4th at 1043; *see also Foley*, 488 F.3d at 387 ("Prejudice from pretrial publicity is rarely presumed."). Even "extensive media coverage and knowledge within the community of the crimes and of the defendant are insufficient by themselves to create a presumption that a defendant was denied a fair trial." *Aguilar v. Chapman*, No. 19-2323, 2020 WL 6703193, at *3 (6th Cir. Sept. 22, 2020) (quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)). As the Supreme Court has recognized, "[p]rominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphasis in original). Rather, to establish "the extreme case" in which presumptive prejudice requires a change of venue, a defendant must clear the "high bar" of demonstrating local prejudice so severe and widespread to justify a presumption that "12 impartial individuals *could not* be empaneled." *Id.* at 381–82 (emphasis added). "For that presumption to apply, the trial must be entirely lacking in the solemnity and the sobriety required of a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Grant v. McKee*, 95 F. Supp. 3d 1041, 1045 (E.D. Mich. 2015), *aff'd*, 647 F. App'x 526 (6th Cir. 2016).

---

[2] The defendant does not allege actual prejudice, nor could he at this pre-*voir dire* stage.

**Argument**

Defendant Bean has failed to meet his heavy burden of demonstrating local prejudice so severe and widespread as to justify the presumption that an impartial jury cannot be impaneled. His alternative request to expand the venire beyond Shelby County is moot, because the venire already draws from the entire Western Division of the Western District of Tennessee. To the extent the defendant seeks to expand the venire beyond the Western Division, his request is premature at best. The defendant cannot establish presumptive prejudice, and other tools at the Court's disposal—including the juror questionnaire the Court has already indicated that it plans to use, *see* ECF No. 113—are more than adequate to address his putative concerns. The motion should therefore be denied.

**A. The Defendant Has Not Demonstrated Presumptive Prejudice**

Defendant Bean has failed to meet the heavy burden necessary to obtain a pretrial change of venue. He argues that because his actions have received extensive media coverage, including negative opinions voiced by various individuals and entities, he is entitled to a change of venue. But the Constitution does not require "that the jurors be totally ignorant of the facts and issues involved." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also, e.g.*, *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir. 1984) (explaining that even "[e]xtensive knowledge in the community of either the crimes or the defendants is not sufficient, by itself, to render a trial constitutionally unfair."); *United States v. Bliss*, 735 F.2d 294, 297–98 (8th Cir. 1984) ("[T]he due process guarantee of trial by a fair and impartial jury can be met even where . . . virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity."). Nor does the Constitution require that jurors be untouched by opinion journalism. To the contrary, in high-profile cases such as the present matter, "scarcely any of those best qualified to serve as jurors will

not have formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722 (quoting *Reynolds v. United States*, 98 U.S. 145, 156 (1878)). The "relevant question is not whether the community remembered the case," or even formed some negative opinion of the defendants, but rather "whether the jurors . . . had such fixed opinions that they could not judge impartially." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984).

The factors courts have considered in assessing presumptive prejudice uniformly militate against finding presumptive prejudice in the present case. First, "the size and characteristics of the community in which the crime occurred" favor retaining the constitutionally prescribed venue. *Skilling*, 561 U.S. at 382. The jury pool in this case draws from diverse and populous counties that are home to approximately 1.1 million people. *See* 2020 Census Data: Tennessee, https://www.census.gov/library/stories/state-by-state/tennessee-population-change-between-census-decade.html. "Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Skilling*, 561 U.S. at 382 (citing, *inter alia*, *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (finding reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals)); *see also, e.g., United States v. Lilley*, No. 2:13-cr-20290-JTF-dkv, 2014 WL 6982456, at *2 (W.D. Tenn. Dec. 8, 2014) (finding that the size of the City of Memphis alone—then 650,000—in the jury pool militated against a finding of presumptive prejudice); *United States v. Bennett*, No. 12-20459, 2013 WL 4521103, at *6 (E.D. Mich. Aug. 27, 2013) (finding that jury pool of approximately 866,000 militated against a finding of presumptive prejudice).

Second, the nature of the publicity militates strongly against finding presumptive prejudice. The factual and opinion reporting described by the defendant does not even approach the type of "blatantly prejudicial information of the type readers or viewers could not reasonably be expected

6

to shut from sight" required to support a change of venue. *Skilling*, 561 U.S. at 382. The foundational Supreme Court case cited by the defendant, *Rideau v. Louisiana*, 373 U.S. 723 (1963), is instructive. In that case, one of few in which the Supreme Court has found presumptive prejudice,[3] the defendant was tried and convicted of murder, among other charges, in a Louisiana parish comprised of only 150,000 people. *Id.* at 724–25. Days before the trial, which took place merely two months after the defendant's arrest, a local television station repeatedly broadcast the defendant's uncounseled and apparently staged confession to audiences of up to 53,000 people. *Id.* "[T]his spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial – at which he pleaded guilty to murder." *Id.* at 726.

The publicity in the present case contains no such confession, let alone an involuntary, videotaped confession broadcast to at least a third of the jury pool, nor does it contain any other such patently prejudicial content. The factual (*e.g.*, video footage of the charged conduct) and opinion (*e.g.*, officials' and experts' opining on the charged conduct) reporting cited by the defendant amounts to no more than the type of "largely factual publicity" that the Supreme Court has instructed trial courts to "distinguish . . . from that which is invidious or inflammatory." *Murphy*, 421 U.S. at 800 n.4; *see also, e.g.*, *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) ("Coverage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change."). Even "extensive, negative pretrial publicity" in the form of opinion reporting is insufficient to support a finding of presumptive prejudice, absent "an inflammatory, circus-like atmosphere." *Campbell v. Bradshaw*, 674 F.3d 578, 593–94 (6th Cir. 2012) (internal citations and quotation marks omitted). This is so because

---

[3] The other two cases—*Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)— involved not only "months [of] virulent publicity" prior to trial but also literal "media interference with courtroom proceedings *during* trial." *Skilling*, 561 U.S. at 380, 382 n.14 (emphasis in original). The defendant has not alleged, and could not allege, such interference at this stage.

7

"[t]o ignore the real differences" between ordinary publicity and inflammatory publicity "would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community, whether they be notorious or merely prominent." *Murphy*, 421 U.S. at 800 n.4.

The nature of the publicity in this defendant's case is thus readily distinguishable from the publicity at issue in *Rideau* and is far more akin to the publicity at issue in *Skilling*. The defendant in *Skilling*, a top Enron executive, was accused of enriching himself at the cost of shareholders and underlings while perpetrating a fraudulent scheme that bankrupted one of the largest companies in the United States. *Skilling*, 561 U.S. at 367–70. News stories about the defendant were "not kind." *Id.* at 382. But the Court reasoned that whereas Rideau's staged confession "was likely imprinted indelibly in the mind of anyone who watched it," the negative reporting about Skilling lacked "blatantly prejudicial information" and thus the nature of the publicity militated against presumptive prejudice. *Id.* The Court distinguished ordinary opinion journalism from the confession at issue in *Rideau*: "A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded." *Id.* (quoting *United States v. Chagra*, 669 F.2d 241, 251–52 n.11 (5th Cir. 1982) (overruled on other grounds by *Garrett v. United States*, 471 U.S. 773 (1985)). As in *Skilling*, the factual and opinion reporting about the defendant is that which would be expected in a case of this profile.

Third, and "unlike cases in which trial swiftly followed a widely reported crime" like the two-months-later trial in *Rideau*, the trial in this case is scheduled for nearly a year and a half after the charged conduct. *Skilling*, 561 U.S. at 383. As in *Skilling*, "the decibel level of media attention diminished somewhat" in this case as time has passed. *Id.* The Sixth Circuit and

8

courts within it have recognized that the natural dimming of media attention that occurs in a year and even less militates against a finding of presumptive prejudice. *See, e.g.*, *DeLisle v. Rivers*, 161 F.3d 370, 385 (6th Cir. 1998) (finding "more than a four-month lapse between the intense coverage and the time of trial, at which time public attention to the case began anew" militated against a finding of presumptive prejudice); *Bennett*, 2013 WL 4521103, at *9 (finding the fact that, despite ongoing publicity, interest had "waned" over the course of 18 months between investigation and trial militated against a finding of presumptive of prejudice).

For these reasons, trial courts in our nation's highest profile cases, including criminal civil rights cases, have repeatedly rejected defendants' attempts to change venue. *See Skilling*, 561 U.S. at 378 n.11 (citing, with approval, those lower courts that have routinely exercised their "discretion to deny venue-transfer requests in cases involving substantial pretrial publicity and community impact" and referencing the 1993 World Trade Center bombing and the prosecution of John Walker Lindh, termed the "American Taliban" by the press); *see also, e.g.*, *In re Tsarnaev*, 780 F.3d 14, 28 (1st Cir. 2015) (rejecting, in Boston Marathon bombing case, mandamus petition filed during *voir dire* that sought a change of venue due to pretrial prejudice because there was an insufficient basis to conclude that "pervasive prejudice taints the entire jury pool"); *United States v. Bowers*, No. CR 18-292, 2022 WL 825437, at *1 (W.D. Pa. Mar. 18, 2022) (denying defendant's motion for change of venue based on presumptive pretrial prejudice in Tree of Life Synagogue mass shooter's hate crimes trial); *see also generally United States v. Hanes*, 2017 WL 3602056, at *3 (D.N.M. Jan. 20, 2017) ("While Defendant's alleged crimes struck the heart of this community, if the Boston and Charleston [Dylann Roof] cases were not exceptional enough to warrant new venues, Defendant's certainly is not. The Charleston church massacre and the Boston bombing received extraordinary, relentless media coverage. It would have been impossible to find a jury

who had not heard of the crime. We cannot ask for opinion free, blank slate juries, just fair ones."). These cases reflect that even in cases with significant, and often significantly negative, pretrial publicity, the constitutional requirement of venue should rarely yield. Defendant Bean has failed to carry his heavy burden of showing that his case is the exception. The relevant factors, taken alone or together, categorically militate against transfer, and the motion should be denied.

### B. Defendant's Alternative Request for Relief is Moot and, in Any Event, No Relief is Merited, Because the Court Has Ample Means to Address Potential Prejudice

Defendant Bean asks the Court to, in the alternative, expand the jury pool beyond Shelby County, but the jury pool already stretches across the Western District to three counties beyond Shelby County. *See supra.* His request is accordingly moot. To the extent his motion could be read to request an even larger expansion of the jury pool, no such remedy is merited, because, as explained above, the defendant has failed to establish any injury that requires a remedy.

In any event, the Court has several more effective and less onerous tools at its disposal to ensure a fair and impartial jury. First, the Court has already taken steps to gather and evaluate additional information about the potential jurors by approving of the use of a supplemental juror questionnaire. *See* ECF No. 113 (granting parties' motion for use of a supplemental questionnaire); *Skilling*, 561 U.S. at 384 (noting that "[a]lthough the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and followup voir dire were well suited to that task").

Second, federal courts have repeatedly emphasized that a thorough and searching *voir dire* is adequate to address the type of concerns raised by the defendant. *See id.* (approving of trial court's *voir dire*, which included individual questioning of each juror and allowed for attorney-led follow-up questioning); *see also, e.g., Knapp v. Leonardo*, 46 F.3d 170, 176–78 (2d Cir. 1995)

(citing "extensive *voir dire*" in finding no manifest error in state court's determination that jury was impartial when defendant argued that 83% of the venire members were excused because they had prejudged the case); *United States v. Higgs*, 353 F.3d 281, 308–09 (4th Cir. 2003) (affirming, in light of effective *voir dire*, denial of motion to transfer venue in which majority of potential jurors had heard about the case and several stated that they had formed an opinion based on publicity).

Third, detailed jury instructions will remind the jury of its charge and limit the jury's exposure to any uptick in coverage that may occur during trial. *See Skilling*, 561 U.S. at 388 n.21 ("We have noted . . . the prophylactic effect of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court.") (internal quotation marks omitted).

Finally, and in the event the defendant establishes *actual* prejudice so pervasive that it renders the selection of an impartial jury impossible, the defendant may move again for consideration of a motion for change of venue. Until then, this Division and this District are home to most of the witnesses and evidence, most of the defendants, the family of the deceased victim, and the community most affected by this case. The trial should occur here.

## Conclusion

Defendant Bean's motion should be denied without prejudice to file a motion based on actual prejudice during *voir dire*.

Respectfully submitted,

KEVIN G. RITZ
United States Attorney

DAVID PRITCHARD
ELIZABETH ROGERS

                Assistant United States Attorneys
                167 N. Main Street, Ste. 800
                Memphis, TN 38103

                KRISTEN CLARKE
                Assistant Attorney General
                Civil Rights Division
                U.S. Department of Justice

By:  s/ Kathryn E. Gilbert
       FORREST CHRISTIAN
       Deputy Chief
       KATHRYN E. GILBERT
       Special Litigation Counsel
       950 Pennsylvania Ave., NW
       Washington, DC 20530
       (202) 616-2430
       kathryn.gilbert@usdoj.gov

## CERTIFICATE OF SERVICE

      I, Kathryn E. Gilbert, hereby certify that the on the date below, I electronically filed the foregoing with the Clerk of Court for the Western District of Tennessee via the Electronic File System which sent notification of said filing to defense counsel.

                                                  s/Kathryn E. Gilbert
                                                  KATHRYN E. GILBERT
                                                  January 18, 2024