# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. No. 2:23-cr-20191-MSN** |
| | ) | |
| **EMMITT MARTIN, III** | ) | |

## RESPONSE TO GOVERNMENT'S MOTION TO
## LIMIT EXPERT TESTIMONY OF BHUSHAN AGHARKAR, M.D.

The defendant, Emmitt Martin, III, through counsel and pursuant to the Fifth and Sixth Amendments to the United States Constitution; Federal Rules of Evidence 702 and 704; *Diaz v. United States*, 144 S. Ct. 1727 (2024); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *In re Winship*, 397 U.S. 358 (1970), and *United States v. Odeh*, 815 F.3d 968 (6th Cir. 2016), respectfully opposes the Government's motion to limit the testimony of Bhushan S. Agharkar, M.D. *See* (Government's Sealed Motion to Limit Expert Testimony of Dr. Bhushan Agharkar, ECF No. 335.)[1] The government claims it seeks merely to limit testimony "to that which is permissible under" evidentiary rules," (Motion, ECF No. 335, pp. 1, 6), opposes virtually all aspects of Dr. Agharkar's expert opinion about Mr. Martin's mental conditions. As explained below, the entirety of Dr. Agharkar's proffered testimony is permissible, and its admission is critical to protecting Mr. Martin's constitutional trial rights.

Dr. Agharkar, who is board certified in both Forensic Psychiatry and Adult Psychiatry and who has extensive experience practicing medicine, teaching, forensic evaluations, and providing

---

[1] Mr. Martin does not have access to PageID numbers for this sealed document. Page numbers in this response refer to the individual page numbers in the referenced sealed filings: Motion, Exhibit 1 (hereafter "Reich Records"), and Exhibit 2 (hereafter "Agharkar Report"). While the government's motion was sealed, Mr. Martin does not move for this response to be sealed.

expert testimony in criminal and civil cases, nationwide and abroad, *see* (Agharkar Report, pp. 1–2); (Martin's Sealed Notice of Second Production of Reciprocal Discovery, ECF No. 321-1 (Agharkar Curriculum Vitae), has formed an opinion about Mr. Martin's mental status at the time of the charged offenses, (Agharkar Report, pp. 6–7.) To reach his opinion, he conducted a clinical interview of Mr. Martin and reviewed Mr. Martin's educational, medical, and professional records; related pleadings, legal authorities, and video footage from this case; and expert neuropsychologist Dr. Malcolm Spica's report. *See* (Agharkar Report, pp. 2–3).[2] Dr. Agharkar opines "to a reasonable degree of medical certainty" that Mr. Martin suffers from Post-Taumatic Stress Disorder (PTSD), which, in combination with the neurocognitive deficits revealed by Dr. Spica's testing, resulted in a mental disease or defect that caused him to lack the capacity to commit the charged offenses. (Agharkar Report, pp. 7–8.) Mr. Martin's mental status directly bears on the issue of guilt in this case and is admissible evidence of diminished capacity.

The government's motion seeks to unfairly restrict Mr. Martin's ability to present a defense and his right to a fair jury trial. Unable to deny that Dr. Agharkar's extensive training and experience make him an expert, the government incorporates its arguments against Dr. Spica's conclusions and claims Dr. Agharkar's opinions "improperly usurp[ ] the role of the jury." (Motion, ECF No. 335, p. 1). The government's attempts to justify the drastic step of excluding Dr. Agharkar's opinions fail. At trial, the government will be given an opportunity to object if Mr. Martin offers expert testimony that it deems impermissible, and the government can certainly engage in cross-examination of Dr. Agharkar to point out any of its issues with his expert opinion.

---

[2] It is unclear why the government says Dr. Agharkar "purportedly" relied on the records identified in his report. (Motion, ECF No. 335, p. 3.)

I.        **FACTUAL AND PROCEDURAL BACKGROUND.**

The government, seeking to put Mr. Martin in prison for the rest of his life, asks this Court to prevent the jury from hearing about Mr. Martin's mental diseases and defects bearing on the issue of guilt. However, Mr. Martin provided timely expert support on this critical issue.

A.        **Mr. Martin provided timely notice of a mental health defense.**

In February 2024, Mr. Martin noticed his intent to produce expert evidence related to a mental disease, defect, or condition bearing on the issue of guilt, and attached the report of D. Malcolm Spica, Ph.D., a Licensed Clinical Psychologist and Neuropsychologist. *See* (Martin's Sealed Notice Pursuant to Federal Rule of Criminal Procedure 12.2(b)(1), Spica Report, ECF No. 154, PageIDs 818–820.) Dr. Spica's proffered testimony is based on his training and experience, a clinical interview, tests and procedures (including embedded tests to determine malingering), and his review of Mr. Martin's medical records and records documenting the November 2022 on-duty incident. *See* (Spica Report at PageIDs 818–820.) As reflected in Dr. Spica's report, which the government challenges separately,[3] Mr. Martin reported a history remarkable for multiple head injuries and multiple experiential traumas in the years and months immediately preceding the incident with Mr. Nichols. (*Id.* at PageID 819.) Dr. Spica's diagnostic impressions were of PTSD and a mild cognitive impairment due to a traumatic brain injury, along with a diagnosis of mixed anxiety and depression following the incident with Mr. Nichols. (*Id.* at PageID 820.) Ultimately, Dr. Spica opined, "Mr. Martin suffers from a combined mental defect and mental disease affecting his subjective awareness of his environment and distorting his interpretation of perceived events while at the same time re-experiencing past trauma." (*Id.*)

---

[3] *See* (Government's Sealed Motion to Limit Expert Testimony of Dr. Malcolm Spica, ECF No. 334.) Mr. Martin has separately responded in opposition to this motion.

In April 2024, Mr. Martin produced copies of records reviewed by Dr. Spica, including Mr. Martin's education records, records related to a November 2022 on-duty incident with Darious Turner where he was hit by a car, and records from four psychotherapy treatment sessions hen had with Eliyahu Reich, Ph.D., in November and December 2022. *See* (Sealed First Production of Reciprocal Discovery, ECF No. 238.) Dr. Reich met with Mr. Martin for counseling purposes, and at each of the four sessions, he recorded a diagnostic impression related to trauma: once as "Personal History of Psychological Trauma (4-days ago)," twice as "Unspecified Trauma-and Stressor-related disorder," and once as "Unspecified trauma-and stressor-related disorder (resolving)." *See* (Reich Records, pp. 3, 5, 9, 10.) Dr. Reich did not report performing any cognitive or neuropsychological tests on Mr. Martin or reviewing any of Mr. Martin's medical, educational, or professional records. Not surprising since he was providing counseling, not conducting a more extensive forensic analysis, a point the government confuses.

In July 2024, Mr. Martin disclosed his experts, including Dr. Agharkar. *See* (Sealed Notice of Second Production of Reciprocal Discovery, ECF No. 321.)[4]

> **B.  Dr. Agharkar's opinions are based on testing, records, and a clinical interview.**

Dr. Agharkar's proffered testimony includes his summary of Mr. Martin's account of his mental functioning at the time of the offense, contextualized by Mr. Martin's preceding traumatic professional experiences. *See* (Agharkar Report, pp. 4–5.) While employed as a police officer, Mr. Martin regularly feared for his life, regularly dealt with death and dismemberment, and regularly suffered injuries—he experienced helplessness, increased anger, numbing, nightmares, and

---

[4] The government makes an aside that Dr. Reich "has not been noticed as an expert despite his near-contemporaneous observations of the defendant." (Motion, ECF No. 335, p. 12.) Dr. Reich is better understood as a fact witness who does not need to be noticed. This response summarizes Dr. Reich's records because the government repeatedly references them, but Dr. Agharkar reviewed many more records. *See* (Agharkar Report, pp. 2–3.)

flashbacks. (*Id.*) Regarding the offense, Mr. Martin related that he had recently returned to work after an on-duty injury when he tried to stop a car that ran a red light. (*Id.* at 5.) Because of how his interactions with Mr. Nichols progressed, he believed his life was in danger or that serious bodily harm could result. (*Id.*)

When Dr. Agharkar interviewed Mr. Martin, he had normal speech, full orientation, a fine mood, congruent affect, linear thoughts, and fair-good insight and judgment. (Agharkar Report, p. 6.) Dr. Agharkar diagnosed him with PTSD and Mild Neurocognitive Disorder. (*Id.*) His evaluation of Mr. Martin's mental status at the time of the offense included the observation that, "Dr. Spica's neuropsychological battery reveals cognitive deficits which, in combination with his PTSD, would result in an over-reaction to environmental threats because of his past experiences with traumatic events." (*Id.* at 7.) Dr. Agharkar's opinion is that Mr. Martin lacked the capacity to violate Mr. Nichols' civil rights because of his mental disease or defect, which also prevented him from knowing that his description of the interaction was false. (*Id.* at 7–8). Dr. Agharkar explains, in part:

> [A]t the time of the alleged offense, Mr. Martin was suffering from PTSD, a mental disease or defect, and that, as a result of that condition, he lacked the capacity to deprive Mr. Nichols of his civil rights because he wholly lacked the capacity to know whether his use of force was unreasonable. Mr. Martin was unable to accurately assess the circumstances of his interaction with Mr. Nichols, which would have been distorted and exacerbated by his past traumatic experiences. There is clinical evidence that Mr. Martin's neurocognitive deficits could potentially result, under significant stress, in an over-reaction to perceived threats whereas someone without his traumatic background would not. . . . Mr. Martin's belief about [factors that elevated his threat assessment of the encounter], regardless of whether or not they actually occurred, directly impacted his assessment of his interaction with Mr. Nichols. . . . Mr. Martin's inability to accurately perceive and assess the circumstances of his interaction with Mr. Nichols due to his PTSD similarly prevented him from accurately recalling and communicating those circumstances following the interaction. As a result, Mr. Martin could not have known that the description of that interaction was false. (*Id.*, p. 8.)

Significantly, Mr. Martin explained in his expert disclosure notice that the experts' reports do not convey every opinion they may be asked to provide at trial, "in large measure because the government's expert disclosures include a broad range of topics, and the defense experts will be testifying after the government's presentation of its case-in-chief, to include its expert testimony." *See* (Sealed Notice of Second Production, ECF No. 321, p. 2.) Still, the reports "fairly provide the government with notice of the topics the expert witnesses' testimony may cover." (*Id.*)

### C.    The allegations in this case make Mr. Martin's mental condition a central issue.

The charged conduct will require the government to prove Mr. Martin purposefully violated the law, and the factual allegations in the indictment raise questions of cognitive functioning, spatial awareness, memory, and other mental qualities. More specifically, Mr. Martin is charged with violating 18 U.S.C. § 242 (which requires proof he acted "willfully"), 18 U.S.C. § 1512(k) (which requires proof he acted "knowingly . . with the intent to"), and 18 U.S.C. § 1512(b)(3) (which requires proof he acted "knowingly . . . with the intent to"). *See* (Indictment, ECF No. 2); *see also* (Order, ECF No. 351, PageID 4716) (describing elements of Counts 3 and 4 to include knowingly and willfully engaging in conduct with the intent to cause a result).

## II.    DR. AGHARKAR'S EXPERT OPINIONS ARE RELEVANT AND RELIABLE.

The government incorrectly argues that Dr. Agharkar's proposed testimony does not meet Rule 702's reliability and relevance requirements, *see* (Motion, ECF No. 335, pp. 10–15), and seeks to exclude opinions that purportedly differ from a treating psychologist's impressions, (*id.* at 12); that purportedly differ from—but are "inextricably intertwined with"—Dr. Spica's conclusions, (*id.* at 11, 13–14); and that are expressed with the word "would," not "quantif[ied]," or "unduly speculative," (*id.* at 14–15.)

Expert testimony must be reliable and relevant, not perfect. "The *Daubert* standard is liberal, and it does not require expert opinions to be bulletproof." *United States v. Lang*, 717 F. App'x 523, 534 (6th Cir. 2017). A witness qualified by "knowledge, skill, experience, training, or education" may testify "in the form of an opinion or otherwise" if the proponent of the testimony demonstrates that "it is more likely than not" that (1) the expert's "scientific, technical, or other specialized knowledge" will help the jury "to understand the evidence or to determine a fact in issue"; (2) the testimony is based on "sufficient facts or data"; (3) the testimony is the product of "reliable principles and methods"; and (4) the opinion "reflects a reliable application of the principes and methods" to the case's facts. Fed. R. Evid. 702. Thus, Rule 702 permits expert testimony if its proponent merely meets the preponderance of the evidence standard, which itself "does not require perfection." Fed. R. Evid. 702, 2023 Advisory Comm. Cmt.

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *United States v. Anderson*, 67 F.4th 755, 768 (6th Cir. 2023) (citation omitted) (rejecting challenge to expert testimony). "The evidentiary requirement of reliability is lower than the merits standard of correctness." Fed. R. Evid. 702, 2000 Advisory Comm. Cmt. Further, a proponent need only show that the testimony will help, not "appreciably help," the jury. Fed. R. Evid. 702, 2023 Advisory Comm. Cmt. ("Applying a higher standard than helpfulness to otherwise reliable expert testimony is unnecessarily strict.") After all, vigorous cross-examination, the presentation of contrary evidence, and instruction on burdens of proof are "'the traditional and appropriate means of attacking shaky but admissible evidence.'" *See United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596).

In *United States v. Odeh*, the Sixth Circuit vacated a conviction because the district court categorically excluded expert testimony about the defendant's Posttraumatic Stress Disorder (PTSD). *United States v. Odeh*, 815 F.3d 968, 979 (6th Cir. 2016). The defendant was charged with violating the criminal denaturalization statute, which required proof she knowingly made false statements; she was prevented by the district court from calling as a witness a clinical psychologist who "would have testified that Odeh's torture gave her chronic PTSD and that this disorder . . . caus[ed] Odeh to interpret questions so as to avoid any thought of her trauma." *Id.* at 976. On remand, the government argued (unsuccessfully) that the expert's testimony should be excluded pursuant to Rule 702 "because it is neither relevant nor reliable." *See United States v. Rasmieh Yousef Odeh*, No. 13-20772, 2016 WL 7092980, 2016 U.S. Dist. LEXIS 168146, at *11 (E.D. Mich. Dec. 6, 2016) (Drain, J.). The court quickly disposed of the government's "somewhat puzzling" argument that the testimony was not relevant because the diagnosis "centered on the defendant's current mental condition" rather than the time of the alleged offense given that the Sixth Circuit had deemed the testimony relevant and concluded that the testimony would help the jury determine whether the PTSD affected the defendant's memory. *Id.* at *11–12. The court also rejected the government's argument that the testimony failed to establish a "causal connection" between PTSD and the defendant's false answers because the expert explained that PTSD may affect someone with PTSD even when not experiencing an acute arousal. *Id.* at *11, 12–13. The court also rejected various challenges to the reliability of the expert testimony, including a complaint that the expert opinion was unreliable "because it rests solely upon the information self-reported by Defendant." *Id.* at *16. However, the expert used the same "gold standard" PTSD diagnostic test as the government's expert and both determined that the defendant likely suffered from PTSD. *Id.* at *16. Finally, the court rejected the government's Rule 403 arguments, noting,

"Any potential prejudice to the Government does not outweigh the probative value of Defendant's potentially exculpatory PTSD evidence." *Id.* at *11, 17. The government's similar reasons to exclude Dr. Agharkar's testimony fail:

> **A.   His opinions about Mr. Martin's mental condition are relevant and reliable.**

Dr. Agharkar's examination in March 2024 was comprehensive, and his conclusions are readily linked to the circumstances of the charged offenses. *See* (Agharkar Report); *Odeh*, 2016 U.S. Dist. LEXIS 168146, at *11. The government makes two related relevancy and reliability arguments. *First*, that Dr. Agharkar's opinion is "inextricably intertwined" with Dr. Spica's report, which the government has argued is unreliable and irrelevant. (Motion, ECF No. 335, p. 11.) Mr. Martin incorporates by reference his response to the government's motion to exclude Dr. Spica's proffered testimony. Dr. Agharkar, like other experts in his field, reasonably relied on his review of Mr. Martin's records and the results of Dr. Spica's cognitive assessment to reach conclusions about Mr. Martin's mental conditions and how the conditions function in practice. *See* Fed. R. Evid. 703. *Second*, that Dr. Agharkar's conclusions are "unduly speculative." (Motion, ECF No. 335, pp. 14–15,) citing a case in which the expert "acknowledged the speculative jumps" in his "chain of analysis," conceding that he knew of no studies linking the relevant considerations and that speculation "led him to guess" at another critical issue. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010). Expert testimony is not normally excluded. *See United States v. Lang*, 717 F. App'x 523, 535 (6th Cir. 2017) (citing *Tamraz.*, 620 F.3d 665, and *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006) (expert "conjured his methods from thin air and lacked the basic technical knowledge that would render an opinion trustworthy"").

Dr. Agharkar's findings rest on his training, experience, and record review. *Cf. United States v. Bourlier*, No. 3:10cr30/MCR, 2011 U.S. Dist. LEXIS 161344, at *6 (N.D. Fla. Apr. 30,

2011) (allowing expert testimony of defendant's multiple sclerosis to negate allegations like "willful" fraud, noting witness did not treat defendant during relevant period but "reviewed medical records from that time period and explained that the disease is progressive"). For both challenges, the solution is cross-examination. Dr. Agharkar's report is an outline of his opinions, not an appellate record of his testimony.

**B.    Opinions that "differ" are relevant and reliable.**

Aspects of Dr. Agharkar's opinions that allegedly differ from Dr. Reich's impressions and Dr. Spica's report do not make his opinions "contradictory," and he need not explain every difference. *See* (Motion, ECF No. 335, pp. 11–13.)[5] Unlike in the cases cited by the government, Dr. Agharkar neither ignored contrary opinions nor misstated legal conclusions. *Compare Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (expert rejected weather data that contradicted his opinion, pilot's testimony, and co-pilot's testimony) *with United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (affirming exclusion of proffered expert testimony "in direct conflict with the district court's legal conclusion" that "numerous misstatements of the law"). Setting aside that Dr. Agharkar is a psychiatrist engaged in a different albeit related inquiry than a psychologist, his opinions incorporate and account for Dr. Spica's assessment. *E.g.*, (Agharkar Report, pp. 5, 6.)

The government seems to have a lot of questions about how psychiatrists reach their professional conclusions and why Dr. Agharkar did not explain at length certain issues the

---

[5] The government complains Dr. Reich's "conclusions" are more trustworthy because they included "near-contemporaneous observations," but Dr. Reich's records were of a treating professional not tasked with forming forensic conclusions, and his observations necessarily cannot establish Mr. Martin's mental condition at the time of the charges because they pre-date them. Moreover, Dr. Reich, even functioning as just a therapist, repeatedly recorded various trauma-related diagnostic impressions for Mr. Martin. *See generally* (Reich Records). Dr. Agharkar similarly noted no psychotic symptoms, which are unrelated to Mr. Martin's diagnoses.

government would like to know more about. *See* (Motion, ECF No. 335, pp. 12–13, 13 n.1). A report need not anticipate every inquiry a prosecutor aiming for a conviction might have in attacking critical defense evidence negating essential mental state elements of the charged offenses. A report is not testimony; it is support for an expert notice, which requires the disclosure of opinions and their bases. The government may ask Dr. Agharkar about any perceived contradictions on cross-examination, then the jury will be instructed to decide how much of the testimony to believe and how much weight it deserves. *See* 6th Cir. Pattern Jury Instr. 7.03 (Opinion Testimony). *Cf. Zeolla v. Ford Motor Co.*, Civil Action No. 09-40106-FDS, 2013 U.S. Dist. LEXIS 10462, at *26, 28 (D. Mass. Jan. 24, 2013) (noting "two sets of experts have interpreted an incomplete set of data, using various assumptions and inferences, to reach opposite conclusions" and concluding all "will be subject to vigorous cross-examination, during which each side will have the opportunity to confront these experts with inconsistencies, and test the fit between the facts and their conclusions").

## III.    RULE 704 DOES NOT PRECLUDE DR. AGHARKAR'S OPINIONS.

An expert does not run afoul of Rule 704(b) of the Federal Rules of Evidence when his proffered testimony includes conclusions about a defendant's mental disease or defect.[6] The government concedes that it must prove that Mr. Martin acted with the requisite *mens rea* for each charged offense but then argues that Dr. Agharkar's proffered conclusions may not be presented to the jury under Rule 704(b). *See* (Motion, ECF No. 335, pp. 6–9.) The government reads Rule 704(b) too broadly.

Generally, an opinion that "embraces an ultimate issue" is not automatically objectionable. Fed. R. Evid. 704(a). Expert witnesses in criminal cases, though, must not state an opinion "about

---

[6] The government suggests without citation that Dr. Agharkar's opinions are limited to Counts 1, 3, and 4. *See* (Motion, ECF No. 335, p. 6.) The report does not contain that limitation.

whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). "[A]n opinion is 'about' the ultimate issue of the defendant's mental state only if it includes a conclusion on that precise topic, not merely if it concerns or refers to that topic." *Diaz v. United States*, 144 S. Ct. 1727, 219 L. Ed. 2d 240, 251 (2024). The Supreme Court recently clarified that Rule 704(b) does not "preclude experts from contextualizing a defendant's mental health condition, including by explaining the likelihood that those with a particular condition would have a particular mental state." *Id.* at 251 (Jackson, J., concurring) (explaining that psychiatrists may, for example, "tell the jury that when people with schizophrenia as severe as [a] defendant's commit acts of violence, it is generally because they do not appreciate the wrongfulness of their conduct," and experts may "testify about the typical mental states of those with battered woman syndrome, helping jurors to better understand how those experiencing it respond to aggression or react to violence").

Reading Rule 704(b) too broadly would keep critical evidence from the trier of fact. Indeed, evidence of mental states "can play a pivotal role in a defendant's attempts both to disprove the *mens rea* in a number of serious crimes and to support a range of defenses, including duress and self-defense." *Id.* at 252 (Jackson, J., concurring). Rule 704(b) "proscribes only expert opinions in a criminal case that are about a particular person ('the defendant') and a particular ultimate issue (whether the defendant has 'a mental state or condition' that is 'an element of the crime charged or of a defense')." *Diaz*, 219 L. Ed. 2d at 247 (approving testimony about knowledge of "most drug couriers" rather than defendant's mental state or "all drug couriers"). Rule 704(b), though narrow, "strikes a very important balance" because it "allows for potentially highly probative expert testimony to be submitted to the jury, while leaving '[t]he ultimate issue of [the defendant's] mental state . . . to the jury's judgment.'" *Id.* at 250 (Jackson, J., concurring).

The prospect of expert testimony on a defendant's mental condition gives rise to a delicate balance. "Expert witnesses cannot 'actually refer[] to the intent of the defendant,' but they may 'simply describe[] in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant . . . also possessed the requisite intent.'" *United States v. Xiaorong You*, 74 F.4th 378, 389 (6th Cir. 2023) (citations omitted). A defendant's failure to link mental condition evidence with a *mens rea* element, though, may lead to its exclusion. For example, in *United States v. Stone*, a defendant charged with general intent crimes involving minors wanted to introduce evidence that he suffered from neurological and psychological difficulties. *See United States v. Stone*, 543 F. Supp. 3d 535, 541 (W.D. Ky. 2021) (Russell, J.). The district court recognized that "cognitive impairments that affect memory are relevant to a person's 'knowledge,' and may potentially negate the *mens rea* for the crimes charged." *Id.* However, the defense expert "did not address whether Defendant's neurocognitive difficulties could have potentially negated Defendant's knowledge or belief that he was communicating with a minor." *Id.* at 541–42.

Here, Dr. Agharkar's proffered testimony describes the effect of Mr. Martin's diagnoses on his mental condition, and his report uses some language from the relevant statutes to establish the link between his findings and the operative issues. Experts may testify that evidence is "consistent with" an ultimate issue. *See United States v. Jaffal*, 79 F.4th 582, 603 (6th Cir. 2023) ("Detective Kekic's belief that he was investigating drug trafficking is not the same as declaring that Jaffal had the intent to distribute drugs. Detective Kekic 'left unstated' the ultimate question of Jaffal's mental state, instead noting only that the evidence was consistent with distribution, which is permissible."). For example, in *United States v. Sublett*, a district court accounted for Rule 704(b) during its review of a defense expert's proposed psychiatric testimony and report,

which the defense wanted to offer to show the defendant "was mentally incapable of forming the *mens rea* required to convict him of a specific intent crime." *United States v. Sublett*, No. 1:04-CR-00037-R, 2007 U.S. Dist. LEXIS 5916, at *1, 2 (W.D. Ky. Jan. 26, 2007) (Russell, J.). The expert's psychiatric examination and review of the defendant's medical history did not find psychoses at the time of the offense but did identify "likely" "factors which could induce an abnormal mental state which might cause a person to be able to form the required specific intent." *Id.* at *2, 6. The expert's opinion was that the defendant's mental condition was "most likely" deteriorating during time of events due to "possible 'anxiety, agitation, depression, confusion, and other symptoms.'" *Id.* at *5. The court ruled that the expert could prevent relevant testimony as to the defendant's mental condition (*i.e.*, "the symptoms of a person with a history of depression who had suddenly discontinued use of his medications and describe the mental health repercussions which tend to affect persons in that situation ") without directly discussing his ability to form the relevant *mens rea*, then the jury could "infer whether Defendant also suffered from those symptoms at the time, and whether the symptoms interfered with his ability to form the requisite mens rea for a conviction." *Id.* at *7–8. Consequently, the government's argument that Dr. Agharkar's proffered testimony violates Rule 704(b) because he refers to Mr. Martin's mental condition overstates the rule's limitation.

## IV.   DR. AGHARKAR'S TESTIMONY IS CENTRAL TO THE DEFENSE.

Evidence that negates an element of the government's proof—here, whether Mr. Martin acted with the requisite *mens rea* for each charged offense—is probative, and its probative value substantially outweighs the government's concerns that the jury could be confused or prejudiced by learning about the defendant's traumatic history. The government's supplemental attempt to exclude the "above-described parts of [Dr. Agharkar's] testimony" (*i.e.*, the entirety of the testimony) is an argument under Rule 403, and it likewise falls short of the drastic step of excluding

expert evidence. *See* (Motion, ECF No. 335, pp. 15–17.) The government asserts that "key conclusions lack probative value because they constitute inadmissible ultimate-issue determinations and improper opinions about defendant Martin's ability to conform his conduct to the law." (*Id.* at 16.) For the same reasons discussed above, the government's arguments are unpersuasive. Dr. Agharkar's opinions concern knowledge and belief, perception and memory, not compelled action. *See* (Agharkar Report, pp. 7–8.)

The government also asserts (without citation) that a defendant's "struggles and life experiences" are irrelevant and would "only serve the improper purpose of appealing to the emotions of the jury." (*Id.* at 16.) Not so. Information about a defendant's history is central to certain mental health diagnoses. For example, Dr. Reich's records reveal that trauma histories and circumstances of past dangers/traumas are part of treatment and, by extension, diagnosis. *See* (Reich Records, pp. 2, 3, 4, 5, 9, 10.) Dr. Agharkar's report reflects his opinion that Mr. Martin's history is relevant to his diagnoses. It would be inconsistent with professional standards, *cf.* Fed. R. Evid. 703, to exclude this information.

According to the government, Dr. Agharkar's testimony would be unfairly prejudicial, confusing, and misleading to a jury because the jury could think a condition "amounts to temporary insanity or ameliorates the offense" or appeal to the jury's emotions. (Motion, ECF No. 335, p. 16.) Relying on older, out-of-Circuit cases, the government suggests "psychiatric" evidence is particularly dangerous. A closer look is helpful. For example, in the cited First Circuit case, the court examined whether expert medical evidence should be excluded when "state of mind" is at issue and said that "concerns about such evidence are considerable," but "we shrink from any generic rule that would forbid the district courts from resolving admissibility case by case." *United States v. Schneider*, 111 F.3d 197, 203 (1st Cir. 1997). "Offenses differ from each other; the

medical evidence, taken alone and in combination with other evidence, is going to vary widely; and this is an area in which everyone is still learning." *Id.* The cited Tenth Circuit decision endorsed the view that mental condition evidence is limited to specific intent charges (untrue in the Sixth Circuit), and the appellate court pointed out that the defense expert "did not opine" on how the defendant's PTSD was "either related to or tended to negate the requisite specific intent element," though the trial court "was willing to consider" such linking evidence. *United States v. Brown*, 326 F.3d 1143, 1147 n.2, 1144 (10th Cir. 2003); *see also United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (noting "appellant failed to identify precisely the psychiatric evidence she wished to introduce," which was only presented by happenstance and without a demonstration that it would negate intent). By contrast, Mr. Martin's expert has linked his conclusions to considerations of intent. Dr. Agharkar's opinions are not confusing or unfairly prejudicial.

## V.   STATEMENTS TO SUPPORT MENTAL HEALTH EVALUATIONS ARE PROPER SUPPORT FOR EXPERT OPINIONS.

The government offers a final failed reason to exclude Dr. Agharkar's proffered opinion: hearsay. The government's argument is wrong to claim the Rules of Evidence prohibit Dr. Agharkar from testifying about Mr. Martin's out-of-court statements. *See* (Motion, pp. 17–18.)

Expert opinions do not need to be based on admissible evidence if an expert in the particular field would rely on similar information. *See* Fed. R. Evid. 703. Where the information would otherwise be admissible, their probative value must substantially outweigh their prejudicial effect. *Id.* In the field of psychiatry, the subject's statements are central to the expert's analysis. *Cf. United States ex rel. Edney v. Smith*, 425 F. Supp. 1038, 1054 (E.D.N.Y. 1976) ("statements by the defendant to his psychiatrist were not admitted to establish the fact of his having committed the murder, but only to establish a basis for the psychiatrist's evaluation of petitioner's sanity at the

time of the offense"); *In re Civil Commitment of M.E.H.*, No. A-5923-05T2, 2008 WL 508158, 2008 N.J. Super. Unpub. LEXIS 1502, at *6–7 (Super. Ct. App. Div. Feb. 27, 2008) ("Psychologists and psychiatrists, however, are entitled to rely upon hearsay information in formulating an opinion as to mental conditions, consistent with the reliance of others in their respective fields.").

Additionally, the cases cited by the government are distinguishable. *E.g.*, *United States v. Ford*, 761 F.3d 641, 651–52 (6th Cir. 2014) (attempt to elicit exculpatory out-of-court statements during cross-examination of government's witness). In *United States v. Beavers*, 756 F.3d 1044, 1054 (7th Cir. 2014), the defendant was charged with tax offenses after a multi-year self-enrichment scheme. Some "state of mind" evidence concerned post-offense conduct, which the court ruled would be admissible *if* the defendant could establish that it was relevant to the time he filed the original tax returns. *Id.* at 1049–50. The court's logic was that "in the absence of a foundation establishing this link, the amended tax returns (and evidence of other remedial actions) did not make it more likely that Beavers believed his original returns were accurate when he filed them." *Id.* at 1050. The defendant did not make that showing. *Id.* at 1050, 1051. The court separately concluded that the defendant's expert (who was determined to be unreliable) could not testify about the defendant's state-of-mind statements to get around cross-examination. *Id.* at 1054. The defense expert was not offering an independent analysis. The court did not allow the expert to provide an opinion that the defendant's transactions were loans because his conclusion "relied heavily" on the defendant's statements that he "considered the transactions to be loans." *Id.* at 1053. Unlike *Beavers*, Mr. Martin did not tell Dr. Agharkar that he did not have the requisite *mens rea*. He described his history and experiences of the events related to the charged conduct. Indeed, Mr. Martin's statements to Dr. Agharkar are the exact type of evidence an expert in his field should

rely on, even if somehow otherwise inadmissible, and their value outweighs any prejudice. *See* Fed. R. Evid. 703; *Odeh*, 2016 U.S. Dist. LEXIS 168146, at *16 (rejecting reliability challenge to expert testimony "because it rests solely upon the information self-reported by Defendant").

## VI.   MR. MARTIN HAS A CONSTITUTIONAL RIGHT TO PRESENT EVIDENCE OF HIS DIMINISHED CAPACITY.

Mr. Martin may offer evidence of his mental conditions through the testimony of a mental health expert like Dr. Agharkar to defend against the charges against him. Testimony about a defendant's mental condition is proper pursuant to the procedures within Fed. R. Cim. P. 12.2(b) and Sixth Circuit precedent. Importantly, a "defendant's right to present a defense 'generally includes the right to the admission of competent, reliable, exculpatory evidence' to negate an element of the offense," which includes the *mens rea* element. *Odeh*, 815 F.3d at 976–77 (citing *In re Winship*, 397 U.S. 358, 363–64 (1970)).

The government incorrectly argues that "many of Dr. Agharkar's key conclusions" are "prohibited" by the Insanity Defense Reform Act and cites cases in which evidence was excluded under the IDRA. *See* (Motion, ECF No. 335, p. 6, 10.) However, Mr. Martin's expert's testimony is offered pursuant to Rule 12.2(b), which sets forth the process for defendants to offer evidence of a mental condition bearing on the issue of guilt, consistent with Sixth Circuit precedent allowing evidence of defendants' diminished capacity. "Diminished capacity" is distinguished from the "insanity defense" because the latter is not concerned with the *mens rea* of the crime. *United States v. Gonyea*, 140 F.3d 649, 651 (6th Cir. 1998); *see also United States v. Kimes*, 246 F.3d 800 (6th Cir. 2001) (distinguishing "diminished responsibility" where insanity absolves defendant of criminal responsibility from "diminished capacity" where mental condition is such that defendant cannot form culpable mental state).

Seeming to recognize the flaw in the premise of its argument, the government acknowledges that the Sixth Circuit allows "evidence that proves that a defendant could not form the required mens rea," though it incorrectly refers to this as a "narrow exception" and accordingly offers a too-narrow understanding of this Circuit's precedent concerning diminished capacity. *See* (Motion, ECF No. 335, p. 9.) Further, the government's arguments do not recognize that evidence of diminished capacity is an issue with constitutional dimensions.

Within the Sixth Circuit, for a long time, although the diminished capacity defense survived the Insanity Defense Reform Act, it was widely understood that a defendant could only raise the issue of diminished capacity to negate the *mens rea* of a specific intent crime, not a general intent crime. *Id.* at 650.[7] *See also United States v. Kimes*, 246 F.3d 800, 806 (6th Cir. 2001). In 2016, the Sixth Circuit clarified that "evidence of diminished capacity is admissible in general intent prosecutions." *United States v. Lilley*, No. 15-6415, 2017 U.S. App. LEXIS 27487, at *10 (6th Cir. July 26, 2017) (quoting *Odeh*, 815 F.3d at 978–79). In *Odeh*, discussed at length in Section I, the Sixth Circuit confirmed that a defendant's ability to negate an intent element makes expert testimony potentially exculpatory. *See Odeh*, 815 F.3d at 973, 979. Dr. Agharkar does not conclude that Mr. Martin had no control over his actions, the government's cherry-picked interpretation

---

[7] "[A] general intent crime requires the knowing commission of an act that the law makes a crime. A specific intent crime requires additional bad purpose." *United States v. Prabhu Ramamoorthy*, 949 F.3d 955, 961 (6th Cir. 2020) (internal citations omitted). *See Lilly*, 2017 U.S. App. LEXIS 27487, at *13 n.2 (expert evidence showing defendant "struggling to read or write properly, depression, anxiety, tending to be a pleaser in relationships, and getting confused as to where one learned a particular fact" went towards negating the defendant's ability to complete the *actus reus*, not *mens rea* ); *Odeh*, 815 F.3d at 978 (explaining holding in *United States v. Gonyea*, 140 F.3d 649 (6th Cir. 1998), that excluded expert testimony because "alleged inability to resist committing the crime did not negate the general intent requirement that a defendant must know that he is doing the act that makes up the crime"); *United States v. Willis*, 187 F.3d 639, 1999 WL 591440, at *7 (6th Cir. July 29, 1999) (inadmissible evidence of paranoid personality disorder in a prosecution for general intent crime as evidence did not suggest defendant did not know he was carrying gun, but instead that he "had no choice but to carry the gun").

notwithstanding. *See* (Motion, ECF No. 335, p. 10) ("to 'neutralize' a threat"). Rather, the ability of Dr. Agharkar's testimony to negate the intent element of his charges makes the testimony exculpatory and a critical component of Mr. Martin's constitutional trial rights. The right to present a defense is "subject only to 'reasonable restrictions' that 'are not "arbitrary" or "disproportionate to the purposes they are designed to serve.'"" *Odeh*, 815 F.3d at 977 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

**VII.   CONCLUSION.**

The government has offered no basis to exclude Dr. Agharkar's testimony. The government's motion refers to "limiting" this expert's testimony, but the cumulative effect of the government's arguments would wholly deprive Mr. Martin of Dr. Agharkar's testimony. As explained below, the Federal Rules of Evidence and federal law allow experts to testify about mental conditions. The proffered opinions outlined in Dr. Agharkar's report are not prohibited by the Insanity Defense Reform Act (IDRA) because the defense has not raised an insanity defense. Rather, the Sixth Circuit's precedent on "diminished capacity" provides the basis for this evidence's introduction. Moreover, the bases for Dr. Agharkar's conclusions are reliable, his conclusions are not unfairly prejudicial, and a proffered report is not an "end-run" around hearsay rules at trial. The government's list of supposed flaws in Dr. Agharkar's report is long, but none require exclusion. *See* (Motion, ECF No. 335, p. 6). Cross-examination, not exclusion, is appropriate. Constitutionally, Mr. Martin is afforded a right to present a defense and for a fair trial, and challenging each essential element is part of that right.

Respectfully submitted this 19th day of July 2024, by:

RITCHIE, DAVIES, JOHNSON, & STOVALL, P.C.

/s/Stephen Ross Johnson
STEPHEN ROSS JOHNSON [TN BPR No. 022140]
CATALINA L.C. GOODWIN [TN BPR No. 038660]
S. RENEE HAMMOND [TN BPR No. 021419]
606 W. Main Street, Suite 300
Knoxville, TN 37902
(865) 637-0661
johnson@rdjs.law
goodwin@rdjs.law
rhammond@rdjs.law

THE LAW OFFICE OF MASSEY MCCLUSKY
FUCHS & BALLENGER

/s/ William D. Massey
WILLIAM D. MASSEY [BPR No. 9568]
3074 East Road
Memphis, TN 38128
(901) 384-4004
w.massey3074@gmail.com

## CERTIFICATE OF SERVICE

I certify that on July 19, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/Stephen Ross Johnson